[File No. 7117]

NATIONAL FARMERS UNION LIFE ASSOCIATION, Respondent, v. OTTO KRUEGER, Commissioner of Insurance of the State of North Dakota, Appellant

(38 NW2d 563)

Opinion filed July 1, 1949.

Nels G. Johnson, Attorney General, Owen T. Owen, Ass't Attorney General, for appellant.

Quentin N. Burdick, for respondent.

BURKE, J. The respondent, National Farmers Union Life Association, is a fraternal benefit society organized under the laws of the State of Colorado. In the year 1946 and for some years prior thereto it had been licensed by the Insurance Department of the State of North Dakota to transact business in this State as a foreign fraternal benefit society. On April 8, 1947, the Commissioner of Insurance of the State of North Dakota, made his order denying a renewal of this license for the year 1947 and assigning his reasons for such denial. The respondent demanded and was granted a hearing upon the question of its right to a license renewal. At the hearing evidence was offered on behalf of both the Association and the Commissioner. Thereafter the Commissioner affirmed his order denying the renewal license. The Association thereupon appealed from the decision of the Commissioner to the District Court of Burleigh County pursuant to the statute authorizing appeals from the decisions of administrative officers. The district court entered judgment directing the issuance of a license to the Association, subject to the condition that it dispose of investments in industrial stocks in the sum of $6,980. The Commissioner has appealed to this court from that judgment and a trial anew is demanded.

The grounds of the Commissioner's refusal to renew the Association's license may be summarized under three headings. First, that the Association has violated express statutory re-

quirements for fraternal societies in that it has failed to initiate members, that it has made contracts of insurance payable to beneficiaries who were not within the permitted class, that it has made loans in excess of statutory limitations and that it has refused to permit examination by the insurance department. Second, it has failed to abide by the terms of its own contracts in that, under its Triangle Certificates, it has allocated a flat amount from premiums to death benefits without regard to the age of the insured persons contrary to the contract provision that the amount allocated for each insured should be the amount required for annual term insurance according to the National Fraternal Congress Table of Mortality and that it has valued its patronage group policies, not according to contract, but according to arbitrary reserve methods which are inaccurate. Third, it has adopted practices in fiscal management and accounting which endanger the association's solvency in that it has invested an excessive proportion of its assets in loans to new and speculative co-operative enterprises, that it has charged off agent's debit balances in the sum of $22,311.95, that it has unwarrantedly deducted $11,510.50 from advance premium liability, that it has made loans in connection with business transactions in which the officers of the Association had a direct interest, that it has paid an excessive salary and bonus to its president and that it has entered fictitious assets upon its books.

The proceeding before the Commissioner was held under the Administrative Practice Act. (Chapters 28–32 ND Rev Code 1943) The scope of review upon an appeal in such a proceeding is settled by § 28–3219 ND Rev Code 1943, which provides:

". . . the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law, or that it is in violation of the constitutional rights of the appellant, or that any of the provisions of this chapter have not been complied with in the proceedings before the agency, or that the rules or procedure of the agency have not afforded the appellant a fair hearing, or that the findings of fact made by the agency are not supported by the evidence,

or that the conclusions and decision of the agency are not supported by its findings of fact."

The Association upon the appeal in district court, and again in this court urged that the findings of fact upon which the Commissioner based his decision and order were not supported by the evidence. To the extent that the Association is right in this contention, the decision of the Commissioner must be reversed.

Before reaching the merits of the case, we must first determine the extent to which the laws of North Dakota and the laws of Colorado apply to the issues in controversy. Upon this issue the statutes of North Dakota control and the statutes of Colorado apply only in the instance where they are made applicable by the laws of North Dakota. A state has the power to make the right of a foreign corporation or association to do business therein dependent upon such terms and conditions as it sees fit to impose. Asbury Hospital v. Cass County, 72 ND 359, 7 NW2d 438; Weiditschka v. Supreme Tent, K. M. 188 Iowa 183, 170 NW 300, 175 NW 835; Modern Brotherhood v. Quady, 175 Minn 462, 221 NW 721, 59 ALR 162; State ex rel. Security Ben. Asso. v. Shain, 342 Mo 199, 114 SW2d 965. The controlling statute is: Section 26–1229, ND Rev Code 1943 which provides:

"No foreign fraternal benefit society shall transact business in this state unless it is authorized and licensed to do so by the commissioner of insurance. No foreign society shall be licensed to do business in this state unless it possesses the qualifications required of domestic societies organized under the provisions of this chapter, nor unless it shall have its assets invested as required by the laws of the state, territory, district, country or province in which it is organized. . . . ."

This statute clearly requires foreign fraternal benefit societies to conform to the laws of North Dakota in regard to all matters except investments, and as to them, they must conform to the laws of the state of incorporation.

The first issue upon the merits is the question of initiation of adult members. Section 26–1201, ND Rev Code 1943 provides:

"Any corporation, society, order, or voluntary association, without capital stock, organized and carried on solely for the mutual benefit of its members and its beneficiaries and not for profit, and having a lodge system with a ritualistic form of work and a representative form of government, and which shall make provisions for the payment of death benefits in accordance with section 26–1216, is a fraternal benefit society."

Section 26–1202, ND Rev Code 1943 provides: "Any society having a supreme governing or legislative body, and subordinate lodges or branches by whatever name known, into which members shall be elected, initiated, and admitted in accordance with its constitution, laws, rules, regulations, and prescribed ritualistic ceremonies, which subordinate lodges or branches shall be required by the laws of such society to hold regular or stated meetings at least once each month, shall be deemed to be operating on the lodge system."

Section 26–1217, ND Rev Code 1943 after authorizing fraternal benefit societies to write insurance upon children, provides: ". . . 1. Such society, at its option, may organize and operate branches for such children, and membership in local lodges, and initiation therein, shall not be required of such children nor shall they have any voice in the management of the affairs of the society; . . . ."

A consideration of these statutes leads to the conclusion, that, in so far as adults are concerned, a fraternal benefit society may write insurance upon the lives of initiated members only.

The complaint of the Commissioner appears to be that under patronage group contracts written by the Association, it has insured families of members of the Association without requiring the adult individuals in such families to become initiated members of the Association. It is asserted that there are approximately two thousand such contracts. Evidence taken at the hearing disclosed that the home office of the Association kept no records at all concerning the individuals who comprised these family groups. Heads of families were listed as members of the Association but their wives and children were

not. It was thus impossible to determine whether such wives and adult children, if there were any, had or had not been initiated as members of the Association.

Mr. Huff, one of the officers of the Association, testified: "The facts are that all of these persons are known in the local community; their names are on record and all of the adult members are initiated into the society in accordance with its By-Laws."

His cross-examination demonstrated that his statement that all members were initiated was founded in part upon his assumption that all local lodges were complying with the By-Laws of the Association and in part upon his experience in participating in initiation ceremonies at many lodges. The Commissioner's finding that the Association did not as a general rule initiate adults insured under these contracts is largely a supposition founded upon an absence of records rather than direct proof. Mr. Dustin testified: "Not having any information (as to the composition of insured families), that would indicate to me that the wives, who would be adult persons in the main, were not initiated members of the National Farmers Union Life Association, and that therefore they were insuring persons who were not members."

Mr. Keim (an examiner for the insurance department) testified that he overheard one of the employees of the Association admit that the wives and children insured under patronage group contracts were not initiated. This hearsay testimony has little probative force. Whether the employee's statement was based upon other hearsay, was conclusion based upon an absence of records, or was founded upon valid information, we have no way of knowing.

Mr. Dustin also testified that the true facts could have been ascertained "by an examination, and within the scope of that examination direct letters, write letters to the membership in those lodges which include patronage group members to ascertain if the individuals had actually been initiated."

The state of this evidence is highly unsatisfactory. It appears that both the Commissioner and the Association, without

much difficulty, could have obtained evidence which would have definitely proved or disproved the charge that the Association did not initiate insured persons. We do not think, however, that the record, as it is, supports a finding that such initiations were not had.

The second issue concerns the Commissioner's finding that the Association had violated the laws regulating fraternal benefit societies by issuing contracts of insurance which violate the North Dakota Statute relating to the payment of the insurance benefits.

The contracts in question have been issued pursuant to an agreement between the Association and the United States of America acting through the Secretary of Agriculture. The agreement sets forth the fact that the Government has made loans to certain individuals and provides:

"Whereas, past experience with such obligations has demonstrated that the death of the principal obligor thereunder (hereinafter referred to as obligor) occasions hardship to the obligor's family, to the Government and to society generally;

Whereas, it is conceived that life insurance for an adequate amount upon the life of each obligor would, if employed in whole or in part for the purpose of retiring his obligations to the Government, eliminate to a considerable degree the hardships enumerated above."

In order for an obligor to obtain insurance in accordance with this agreement it is required that he execute an authorization and request for life insurance. This authorization is directed to the Secretary of Agriculture. It requests that the Secretary of Agriculture make application to the Association for insurance for the obligor "all in accordance with the agreement" between the Secretary and the Association. This authorization and request directs that the death benefits payable under the insurance shall be disbursed as follows:

"Beneficiary: I designate as my beneficiary or beneficiaries ........................, having the relationship to me of ........................, and I request that upon my death the proceeds of this insurance be disbursed as follows:

(a) not to exceed $100.00 for my burial expenses.

(b) 50% of the balance thereof, but in no event a sum greater than the amount of my indebtedness to the Government at the time of my death, to repay the whole or any part of my obligation to the Government, or to be disbursed, at the discretion of the Government, at such time and in such manner as the Government shall determine will aid in the rehabilitation of my family.

(c) The remainder thereof to my designated beneficiary or beneficiaries. In the event the person or persons so designated predecease me, then the remainder to ....................., equally, share and share alike or to the survivor or survivors of such persons, if more than one be named. If none of the above named persons survive me, then the remainder of such proceeds shall go to my estate.

This beneficiary request may be amended only with the consent of the Government."

This direction is in complete accord with the contract between the Association and the Secretary of Agriculture which provides:

"The proceeds of the insurance hereunder shall be disbursed through the Government, and the Government shall have the facility and right to make such disbursement in the manner and for the purposes set forth in the beneficiary designation contained in the obligor's 'Authorization and Request for (Class A or Class B) Life Insurance' ".

Upon the approval of the application for insurance an individual certificate of insurance is issued to the member. This certificate designates as beneficiary only the person or persons expressly named as such in the authorization and application. It contains no mention of the Government or of the fact that the Government is entitled to a part of the proceeds of the insurance. By the terms of the agreement between the Association and the Secretary of Agriculture, however, the provisions of the certificate of insurance are not controlling for it is expressly stated in such agreement that "the character, incidents and nature of membership and insurance arising under this agreement shall be determined and measured by the appli-

cation, the certificate of insurance, the Articles of Incorporation and the Constitution and By-Laws of the Association and by the provisions of this agreement." Since this is the case, the insurance benefits arising under these certificates must be disbursed in accordance with the terms of the beneficiary designation in the "Authorization and Request" rather than the beneficiary designation contained in the insurance certificate.

Section 26–1219, ND Rev Code 1943, provides: "The payment of death benefits shall be confined to wife, husband, relative by blood to the fourth degree, father-in-law, mother-in-law, daughter-in-law, son-in-law, stepfather, stepmother, stepchildren, children by legal adoption, to a person or persons dependent upon the member, a person or persons upon whom the member is dependent, or the member's estate. If the member shall become dependent upon an incorporated charitable institution after the issuance of the original certificate, he shall have the privilege, with the consent of the society, to make such institution his beneficiary. Within the above restrictions, each member shall have the right to designate his beneficiary, and, from time to time, to have the same changed in accordance with the laws, rules, and regulations of the society. No beneficiary shall have or obtain any vested interest in the said benefit until the same has become due and payable upon the death of the member. Any society, by its law and within the above classes, may limit the scope of beneficiaries."

This statute restricts the persons who may be named beneficiaries to certain designated classes, it reserves to the members the right to change beneficiaries and it prohibits a beneficiary from acquiring a vested interest in any benefit prior to the death of the member.

The Association contends, first, that the above statute does not apply to its contracts but that the statutes of Colorado which contain no such restrictions, control, and second, that the beneficiary designated in the challenged contract is within the restrictions contained in the North Dakota statute.

The first contention has been settled adversely to the Association by what we have said above, viz: that the laws of the

State of North Dakota require foreign fraternal benefit societies to conform to the laws of this state regulating domestic societies with the single exception of the regulation of investment of assets and that the State of North Dakota has the power to require such conformity.

As to the second contention, we are satisfied that the Association is in error. It is true that the person or persons who are explicitly denominated beneficiaries in the insurance certificates are within the statutory limitations, but, under the contract, part of the death benefits are made payable directly to the United States Government. To the extent that the Government shares directly in the proceeds of the insurance it is either a beneficiary or an assignee. It matters not which for in either event the contract in question violates the limitations prescribed by Section 26-1219, supra, in that it vests in the Government an interest in the proceeds of the insurance prior to the death of the insured member and denies to the member the right to change his beneficiary without the consent of the Government. In effect the contract assigns an interest in the insurance benefits to secure a debt due the Government. Such an assignment is contrary to law. "Neither the society nor a member, nor the two combined, can divert the fund from the classes prescribed." 46 CJS 929; Hubbell v. Fidelity Life Asso. 290 Ill App 66, 7 NE 925; Modern Brotherhood v. Quady, 175 Minn 462, 221 NW 721, 59 ALR 162; Coffman v. Security Ben. Asso. 131 Kan 328, 291 P 753. Officers of the Association testified that no payment of benefits had ever been made directly to the Government. This was not explained. If an insured person owed money to the Government at the time of his death, it was the Association's obligation under the contract to make payment directly to the Government.

It must be mentioned, however, that this contract was filed with a predecessor of the present Insurance Commissioner, that it was approved and issuance of certificates pursuant to its terms was authorized. The Association asserts that these facts estop the present Commissioner from taking any action concerning the contracts issued pursuant to such authorization. No argu-

ment need be made or authority cited to sustain the proposition that the association can not and did not acquire a continuing right to violate the law by estoppel. The circumstances are, nevertheless, extenuating ones. They indicate that the violation on the part of the Association was neither willful nor in bad faith.

The next issue on the merits concerns the Commissioner's finding that the Association has made loans in excess of statutory limits. The Colorado law applies to the matter of investments and this issue turns upon a construction of that law. If the interpretation placed upon that law by the Insurance Commissioner and the Attorney General of Colorado is correct, it is conceded that the loans in question are not excessive. If the interpretation of the Insurance Commissioner of North Dakota is correct and controlling, it is conceded that these loans are excessive. The Colorado statute is Chapter 154, Laws of Colorado, 1941. In so far as it is applicable here, it provides that investments may be made "In first liens upon real estate and buildings thereon not exceeding sixty-five per cent (65%) of the value thereof; the buildings to be valued at not more than the amount for which they be insured against loss or damage by fire in some reliable fire insurance company or companies in favor of the lending company; . . . ."

The Insurance Commissioner of North Dakota contends that this statute limits the amount of real estate loans to an amount equal to the sum of sixty-five per cent of the appraised value of the real estate and sixty-five per cent of the amount of the insurance placed upon the improvements. The Insurance Commissioner and the Attorney General of Colorado say that the limit is sixty-five per cent of the appraised value of the real estate and improvements provided that the improvements are insured for sixty-five per cent of their value. The part of the Colorado statute, quoted above, is ambiguous in that there appears to be a contradiction between the first and second clauses of the first sentence thereof. If it is reasonably possible such a statute should be construed to harmonize the seemingly contradictory parts. State ex rel. Erickson v. Burr, 16 ND 581,

113 NW 705. In construing a statute the policy and the purpose of the act should also be considered. Home Owner's Loan Corp. v. Wright, 71 ND 235, 299 NW 860. And the courts will give weight to the practical construction of a statute by those charged with the duty of executing and applying it. Ford Motor Co. v. State, 59 ND 792, 231 NW 883; State ex rel. Gammons v. Sorlie, 56 ND 650, 219 NW 105.

The provision of the Colorado statute with respect to insurance has only one purpose and that is to protect the loaning company and its creditors from loss in the event of damage by fire to the property which secures the loan. It is only in the event of such damage that the amount of insurance has any relation to the value of the security. It would seem therefore that a requirement that a building be insured to the full extent that it is security for the loan is an adequate and reasonable provision. Such a construction harmonizes and gives effect to the seemingly contradictory parts of the statute and is in accord with the executive construction in Colorado. We therefore adopt it. It follows that the loans in question are not excessive.

The fourth point in issue concerns the Commissioner's finding that the Association has refused to permit examination. The finding is founded upon a statement in a letter addressed to the Commissioner by the Comptroller of the Association. In July 1946, the Commissioner had asked for an unlimited examination. In his letter of July 10, 1946, requesting the examination he had suggested a convention examination by stating, "If you would choose at this time to have any other states concur in this examination, we would be pleased to have them, as it would shorten our work and save us some time which we might better use on our own companies here in the State of North Dakota." On July 20, 1946, the Comptroller of the Association wrote the Commissioner asking "Will North Dakota participate in a convention examination of this Association to be called at once by Commissioner Kavanaugh?" (Insurance Commissioner of Colorado) He concluded this letter with the statement, "If your answer is negative, it is agreed here that there shall be no examination at this time." After receiving this letter the Com-

missioner agreed to the convention examination. In view of the expense of examinations, which must be paid by the Association, it certainly cannot be blamed for attempting to have two or more states participate in the same examination. The wording of the Comptroller's letter, it is true, suggests an ultimatum that, unless the convention examination were agreed to, an examination would be refused. The Commissioner could have receded from his suggestion for a convention examination and insisted on an individual examination by his department, and in the event it was refused, taken disciplinary steps against the Association. This he did not choose to do. He agreed to the offer of the Association. The record does not support a finding that the Association refused to permit an examination.

The next issue concerns the Commissioner's finding that the Association had violated its contracts in making allocations to death benefits under its Triangle Certificates. In this regard the report of the conference examiners shows the following:

"Of the total premium for a Triangle certificate, a flat amount is considered by the Association as applying to the death benefits, regardless of the age of insureds or, in the case of family contracts, the number of members in the family. This is contrary to the following provision of the contract:

'Of the total net premiums hereunder there shall be allocated for death benefits premiums for each insured, the amount required for annual term insurance under the National Fraternal Congress Table of Mortality, as adopted by the National Fraternal Congress, August 23, 1899, with an interest assumption of four (4) per cent per annum, for his attained age and for the amount of death benefit provided.'

Test calculations for local groups selected at random show that, although the net 'death benefit premiums' computed according to the above quoted provisions may in particular instances exceed the amounts actually allocated by the Association, in the aggregate the flat 'per-certificate' premiums exceed the individually calculated ones by considerable margins.

In response to the suggestion that either the Association comply with the contracted requirement in this respect or amend

the contract to correspond with actual practice, the management has agreed to follow the latter course."

The statements of the report are not challenged by the Association or by the Commissioner. The record shows that Mr. Keim, the examiner for the Commissioner, concurred in the suggestion made to the Association and in the Association's acceptance of one of the examiners' proposals. This act of the examiner does not bind the Commissioner. His duty was merely to ascertain the facts. The Commissioner's duty was and is to require compliance by the Association with the statutes of this State. Section 26–1234, ND Rev Code 1943 reads:

". . . The legal minimum standard of valuation for all certificates, except for disability benefits, shall be the National Fraternal Congress Table of Mortality and four per cent interest, or, at the option of the society, any higher table or a table based upon the society's own experience of at least twenty years and covering not less than one hundred thousand lives, with interest assumption of not more than four per cent per annum. . . ."

Section 26–1237 ND Rev Code 1943 provides:

"Any fraternal benefit society which accepts in its laws the provisions of this section may value its certificates, in lieu of the manner or manners provided in section 12–1234, on the accumulation basis or on the tabular basis, subject to the provisions herein contained. . . ."

The By-Laws of the Association provide:

"All certificates shall be issued on a basis providing for adequate reserves to mature such certificates upon the assumption of American Experience Tables of Mortality, or upon Commissioner's 1941 Standard Ordinary Tables, and three per cent (3%) interest per annum, and the Association shall maintain certificate reserves as required by law."

The Association's contract provides that the Triangle Policies shall be valued in the manner set forth in Section 26–1234, supra. The "flat rate" used by the Association is computed upon a basis which reserves an equal amount for all adults regardless of age and for all families regardless of the number of individuals in

such families. It is clear, that this method of valuation is not in accord with the statutes of North Dakota, the By-Laws of the Association or its contract. However, the facts that the "flat rate valuation" has been continued upon a suggestion which was concurred in by the Commissioner's examiner and that it has produced a reserve in excess of that which the contract method would have produced, indicate that the Association has acted in good faith.

What we have said immediately above applies to the Commissioner's finding that the Association has not valued its Patronage Group Contracts according to the contract, the Association's By-Laws or the statutes of North Dakota. Upon these policies the Association reserves one-half of the annual premiums upon the insurance in force. It has followed this practice for the reason that it lacked sufficient information concerning the ages of all persons insured under family contracts, to value the policies upon the basis of age and life expectancy. The examiners state in their report, that on the basis of the Association's experience, these reserves are adequate. The method of valuation is, nevertheless, contrary to the statutes and By-Laws above set forth. At the hearing in this proceeding the Association offered in evidence a new form of application which it has adopted for use in connection with the Patronage Group Contracts. This form will contain all the information needed for a valuation of the contracts according to the By-Laws and the statutes.

We shall next consider the Commissioner's finding that the Association has endangered its own solvency by investing an excessive proportion of its assets in loans to speculative cooperative enterprises. This finding appears to be a pure conclusion unsupported by any evidence. No loan to a cooperative is in excess of sixty-five per cent of the appraised value of the property which is security for it. No such loan is in default as to principal or interest.

The Commissioner contends that he has the power under § 26-0106, ND Rev Code 1943, to refuse a license to an Association when in his opinion its investments cease to remain secure. If this power exists, an issue which we do not decide,

it is one which must be exercised in the light of evidence and not upon speculation. Here all loans to cooperatives are indiscriminately challenged for the reason that such a large percentage of the association's investments are of this type. No single loan is questioned, nor is the solvency of any borrower challenged. It is said that because of the nature of these loans a business recession will endanger the solvency of the Association. We know of no economically sound reason why a business recession would be more detrimental to a cooperative enterprise than it would be to other modes of business activity. The finding is not sustained by the evidence.

The next issue upon this appeal arises upon the Commissioner's finding that the Association in 1945, charged off $8,000.00 and in 1946, $14,311.95, or a total of $22,311.95 of agents' debit balances. The Commissioner states that these charge-offs are evidence of poor business management, which justifies the cancellation of the license. The Association says that the Commissioner's conclusion that it permitted its agencies to become indebted to it in exorbitant amounts is unjustified and contrary to the facts. Mr. Huff explained that the Association's expenses in connection with writing business in accordance with its contract with the Farm Security Administration at first exceeded earnings, that this excess was set up as a capitalized expense item, and the Association reserved in full $400,000 of the premium income upon this business. Proper distribution of this premium income paid the expense and the item was accordingly charged off. Mr. Huff further stated that no part of the charge-off represented an advance to an agent. Since the only evidence in the record as to the exact nature of these charge-offs is that of Mr. Huff, we find that the Commissioner's conclusions concerning them are not sustained by the record.

We next consider the Commissioner's finding that the Association prematurely credited advance premium payments of $11,510.50 as earned premium. The premiums were paid upon the Association's Farm Security Administration contracts. The Commissioner contends that the Association had a contingent liability for a return of a portion of this premium for the

reason that its contract with the Farm Security Administration might be cancelled upon 180 days notice.

The Commissioner has clearly misconstrued this contract. Article 7 of the contract provides: "Subject to the notice requirement defined below, the Government shall have the right *as of any anniversary date* of this agreement to terminate its *future operation* . . . . To effect such a termination the Government shall give the Association a written notice of its intention in the premises at least one hundred eighty (180) days in advance of the anniversary on which termination is to occur . . . . ".

The anniversary date of the agreement is March 28th. After March 28th in any year, the agreement could not be cancelled until March 28th of the succeeding year and then only upon 180 days prior written notice. The record is not clear, but it appears to be assumed by both the Commissioner and the Association that the premiums in question were for the calendar year 1946. Since no notice of cancellation had been given by September 28, 1945, the contract could not thereafter be cancelled prior to March 28, 1947. There was therefore no contingent liability upon the Association for the return of any of the 1946 premiums. The Commissioner's conclusions concerning this item are therefore not sustained by the evidence.

The Commissioner found that the Association had made loans in connection with transactions in which some of its officers were directly interested and out of which they made a profit. The Association concedes that this finding is correct as to one transaction. The record shows that in 1943 Mr. Huff and Mr. Patton, officers of the Association, borrowed from it for the purpose of purchasing a tract of land. The loan was criticized by the examiners in 1944 and it was immediately sold without recourse to another Denver life insurance company. Later Mr. Huff and Mr. Patton sold the land to one Fritzler who financed his purchase in part by a loan through the Association. There is no complaint that the loan is excessive or that it was made upon inadequate security. It is contended by the Association that these loans are legal in all respects for the reason that the laws

of Colorado governing fraternal benefit societies do not expressly bar such loans. This contention can not be upheld. The funds of mutual benefit societies are trust funds. Appleman, Insurance Law and Practice, 1945, sec. 10, 180; Grand Lodge, A. F. & A. M. v. Callier, 224 Ala 364, 140 So 557; Shafran v. St. Nicholas Ruthenian Greek Catholic Sick & Death Ben. Soc. 117 NJ Eq 54, 175 A 139; Clifford v. Firemen's Mut. Benev. Asso. 232 App Div 260, 249 NYS 713, affd without op 259 NY 547, 182 NE 175; National Circle, D. I. v. Hines, 88 Conn 676, 92 A 401. It is well established that trustees may not place themselves in a position where their personal interests will conflict with their duties as trustees. 65 CJ (Trusts) 652. They may not make loans to themselves under cover of investments. Carrier v. Carrier, 226 NY 114, 123 NE 135. Both the loan to themselves and the loan to Fritzler were transactions in which Patton and Huff had an interest adverse to their duties as trustees. As such they were improper even though in these specific instances the society and its certificate holders were amply protected.

The Commissioner also found that the Association has paid its president an excessive salary and bonus. The amount was $7,000.00 per year. It is said that the salary is excessive because it amounts to over 80 per cent of the Association's free surplus of $8,000.00.

The examiner's report (Exhibit A) shows that the Association has over $23,000,000.00 insurance in force and a solvency ratio of 121.399 per cent (actual to contingent). Its income from all sources for the first six months of 1946 was $238,366.13. It had on June 30, 1946 ledger assets of $907,379.79. Whether a salary is excessive in the sense that justifies the interposition of the regulatory power of the Commissioner can not be determined upon the basis of his business judgment alone. The power to regulate does not include the power to manage and he may not substitute his judgment as to what a proper salary would be for that of the directors of the Association. Northern States Power Co. v. Railroad Comrs. 71 ND 1, 21, 22, 298 NW 423. On the other hand if salaries are excessive to the extent that

their payment by the Association constitutes "conducting business fraudulently" it is the Commissioner's duty to intervene. Section 26-1241 ND Rev Code 1943.

In this case no evidence has been presented to show that the salary of the Association's president is excessive. There is only the assertion that it is disproportionate to the Association's free surplus. This is not sufficient to support a finding that such salary is excessive.

The next issue for consideration arises upon the Commissioner's finding that the Association has entered fictitious assets upon its books. The finding concerns the book entries made by the Association upon withdrawals of "deposit funds." These funds are premiums deposited by certificate holders for the purpose of converting the insurance held by them to a higher premium type. These deposits accumulate at a fixed rate of interest. The depositor has the privilege of withdrawing these funds upon written request at any time prior to the actual conversion. The Commissioner's finding is based upon the following statement from the conference examination. (Exhibit A) "Since the current practice of the Association is to consider all such withdrawals as certificate loans, the above total represents the full amount of deposit fund accumulations, the amount of any withdrawals being included in the asset item,— Certificate loans."

The conclusion drawn from the fact that the withdrawals have been entered as assets and not as deductions from the deposit liability is that fictitious assets and fictitious liabilities have been created in equal amounts, and that the net result is to increase without warrant the footings on both sides of the ledger thus showing a financial condition not in accord with the Association's contracts. Mr. Huff, testifying for the Association, stated that the conclusion was not justified; that the assets entered as certificate loans were, in fact, certificate loans. He stated, "the facts are as follows: In any event in which a member asks for withdrawal of his deposit fund, such return is made to him promptly and in full, including interest thereon, and no loan agreement is made unless by request of the policy holder

. . . unless the owner of the deposit requests any withdrawal to be made in the form of a loan for ease in reestablishing his deposit account so as to mature his policy at an earlier date. Every request for withdrawal of deposit, and there have been very few, has been met by compliance on the part of the company with the contract itself. It has been returned to him and the account has been closed." This is direct testimony that these book entries are just what they purport to be. Opposed to it are conclusions that they are not. The direct testimony must prevail.

Upon this appeal, the Commissioner urges that if Mr. Huff's testimony is correct, the certificate loans are unauthorized. It is stated in his brief, "The supplement was originally drawn with the right of withdrawal and *apparently* with no provision for loan privilege. . . . Since the original supplemental agreement did not have a loan clause included, *according to the report,* we cannot see by what right . . . the loan agreement could be inserted therein." The wording of the argument demonstrates that it is made upon speculation. The report does not say that the contract has no loan clause. It simply does not state whether it has or not. There is no evidence therefore to support the contention that these loans are unauthorized.

Finally we reach a consideration of the finding that the Association has carried as admitted assets an unauthorized investment of $12,980.00 in industrial stocks. The conference examination report (Exhibit A) lists the amount invested in industrial stocks by the Association as $6,980.00 and states, "The first item includes stocks in two nationally known corporations and are included at the purchase price therefor. The market value on June 30, 1946 was $7,490.62. While Colorado statutes do not list stocks as investments for capital and reserves of an insurance company, they have, however, been allowed as surplus at the market value thereof. The difference of $510.62 has been entered as a non-ledger asset." It appears therefore that the amount invested in industrial stocks was $6,980.00 rather than $12,980 and that the Commissioner's examiner concurred in allowing this investment as an admitted asset. The investment is

nevertheless, one which is not permissible under the Colorado law and it should not have been carried as an admitted asset or allowed by the examiners as one.

Summarizing our conclusions, we have found that the Commissioner should be sustained upon four of the findings upon which he based his decision to refuse to renew the Association's license. They are, (1) that the United States Government has been made a beneficiary or assignee under the Association's patronage group contracts in violation of the Statutes of North Dakota; (2) that the Association has made allocations to death benefit reserves upon a basis which is neither in accord with its contracts nor permissible under the laws of the State of North Dakota; (3) that the Association made one loan to its officers and another in connection with a transaction out of which the officers made a profit; (4) that the Association had made an unauthorized investment in industrial stocks in the sum of $6,980.

The record shows, however, that the group patronage contracts were filed with and approved by a predecessor of the present Commissioner. It shows that the method of making allocations to reserves upon the Association's Triangle contracts were continued upon a suggestion concurred in by the. Commissioner's examiner, and that the Association has already taken steps to remedy the defects in the methods of allocating reserves under its group patronage contracts. It shows that the reserves set aside under these contracts, while irregularly allocated, have been adequate. It shows that the loan to the Association's officers, made in 1943, was sold as soon as it was criticized and that the Fritzler loan and the investment in industrial stocks were allowed as admitted assets by the Commissioner's examiner. The record also shows that the Association has a solvency ratio of 121.399 per cent (actual to contingent) and that it has given "prompt and equitable treatment to certificate holders and beneficiaries as reflected by claim files."

In view of the circumstances that the Association's certificate holders are adequately protected and that the violations of law complained of by the Commissioner were either approved by his predecessors in office or condoned by his examiners, the

cancellation of the Association's license without giving it an opportunity to conform to the law, as construed by the Commissioner and as now construed by this court, is too drastic a penalty.

We therefore direct that the order of the Commissioner be modified, to provide the license of the Association will be cancelled, or a renewal license denied, unless the Association, within a reasonable time, to be fixed by the Commissioner, shall furnish to the Commissioner satisfactory evidence that it is doing business in accordance with the laws of this State.

The case is remanded to the district court for the entry of judgment in accordance with this opinion.

NUESSLE, Ch. J., MORRIS and CHRISTIANSON, JJ., and SWENSON, District J., concur.

BURR, J., did not participate.